UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA – CENTRAL DIVISION

| | |
|---|---|
| JEROMEY COPELAND,<br><br>Plaintiff,<br><br>vs.<br><br>GENESIS DEVELOPMENT,<br><br>Defendant. | CASE NO. 4:19-cv-00138-RGE-CFB<br><br>**PLAINTIFF'S FIRST AMENDED PETITION** |

COMES NOW the Plaintiff, Jeromey Copeland, through his attorneys, Wandro & Associates, P.C., and for his First Amended Petition against the Defendant (pursuant to Fed. R. Civ. P. 15(a)(1)(B)) states to the Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      The Plaintiff, Jeromey Copeland, at the time of the discriminatory actions alleged herein, was a resident of Indianola, Warren County, Iowa.

2.      The Defendant, Genesis Development, at all times material hereto, was registered as a domestic non-profit organized under Iowa Code chapter 504, with its principal place of business in Jefferson, Greene County, Iowa. Its office in Indianola, Warren County, Iowa, is where Plaintiff was employed at all times material to this action.

3.      All discriminatory actions complained of herein occurred in Warren County, Iowa.

4.      The actions complained of herein were the subject of two timely filed complaints of discrimination filed with the Iowa Civil Rights Commission (ICRA) and the U.S. Equal Employment Opportunity Commission (EEOC) on or about July 26, 2018, and September 18, 2018, which were filed against the named Defendant.

5.     Genesis Development is an employer as that term is defined by the Iowa Code §

216.2(7) and as defined by 29 U.S.C. § 2611(4)(A).

6.     The ICRA, in conjunction with the EEOC, issued 60 day right to sue letters on

February 7, 2019, and February 8, 2019 with regard to the claims against Genesis Development.

7.     FMLA law states that an action to recover the damages or equitable relief

prescribed in 29 U.S.C. § 2617(a)(1) may be maintained against any employer in any state court

of competent jurisdiction. 29 U.S.C. § 2617(a)(2).

8.     This Court has jurisdiction and venue over the claims herein.

### FACTUAL BACKGROUND

9.     Defendant hired Jeromey Copeland on May 11, 2012.

10.    In December 2017, Mr. Copeland was diagnosed with narcolepsy.

11.    Narcolepsy is a serious neurological and autoimmune disorder that prevents the

brain from regulating sleep cycles normally. Symptoms of narcolepsy include daytime

sleepiness, disrupted nighttime sleep, cataplexy, hallucinations upon falling asleep or waking,

and sleep paralysis.

12.    Mr. Copeland's narcolepsy is a disability under the Iowa Civil Rights Act. His

narcolepsy substantially limits one or more major life activities. Mr. Copeland has a record of

such impairment and is regarded as having such an impairment. As a direct result of his

narcolepsy, Mr. Copeland has difficulty caring for himself, performing manual tasks, learning,

and working.

13.    In December 2017, Mr. Copeland submitted his FMLA paperwork to Defendant's

Director of Services, Justin Terry.

14.     Originally, when Mr. Copeland began experiencing symptoms of narcolepsy, he was in a Team Leader position. After his diagnosis, and after Mr. Copeland's son began to experience significant mental health issues, Mr. Copeland realized he needed a job with less responsibility and more flexible hours, so he voluntarily stepped down and began to work as a Discovery Aid.

15.     Mr. Copeland began work as a Discovery Aid with Defendant's understanding that the reason he needed to work as a Discovery Aid rather than a Team Leader was because of his medical condition and the need for less demanding hours.

16.     On at least one occasion when Mr. Copeland experienced a narcoleptic flare-up, Mr. Terry and Mr. Copeland's direct supervisor, Michele Butler, demanded that he provide her a doctor's note to prove that he had in fact been experiencing a narcoleptic flare-up.

17.     Mr. Terry consistently spoke to Mr. Copeland in a demeaning manner as Mr. Copeland attempted to exercise his FMLA leave rights. Mr. Terry told Mr. Copeland on at least one occasion that Mr. Copeland did not know what FMLA was and that FMLA only protects his job, not work absences.

18.     No one at Defendant's office ever explained to Mr. Copeland what his rights were under FMLA, nor did it appear that Defendant understood what Mr. Copeland's rights were under FMLA.

19.     Mr. Terry constantly reminded Mr. Copeland that he was well-paid for his position, and that because of his wages and his supervisory experience Defendant had higher expectations for him as an employee. In response, Mr. Copeland would remind Mr. Terry that due to his medical condition he was no longer able to perform at the same level, which is why he stepped down to a less demanding position.

20.    When Mr. Copeland attempted to exercise his FMLA rights and take appropriate leave, Mr. Terry routinely reminded Mr. Copeland that Mr. Terry could terminate his employment, but said that he "didn't want to do that to [him]." These threats of termination made Mr. Copeland wary of taking FMLA leave.

21.    Defendant never provided Mr. Copeland with an eligibility notice as required by FMLA law and by its own internal handbook, including: (1) a definition of the 12-month period Defendant uses to keep track of FMLA usage; (2) notice of Mr. Copeland's right to use paid leave; (3) notice of whether Defendant would require Mr. Copeland to use his paid leave; (4) notice of Mr. Copeland's right to maintain his health benefits and whether he would be required to make premium payments; and (5) notice of his right to return to his job at the end of his FMLA leave. Defendant also never provided Mr. Copeland with his FMLA rights and responsibilities.

22.    Defendant would only allow Mr. Copeland to take planned time off from work if he did not exercise his FMLA rights by calling in because of his narcolepsy. For example, Mr. Copeland requested the week of April 24 – 27, 2018 off from work with at least one months' notice because he was moving into a new home he had just purchased and knew that he would be physically and mentally exhausted because of his narcolepsy. Mr. Copeland did not intend nor attempt to use FMLA leave for this time off.

23.    Ms. Butler denied Mr. Copeland's request and told Mr. Copeland that Mr. Terry had told her that she didn't have to approve his time off. Mr. Copeland pointed out to Ms. Butler that another employee had taken time off to renovate her home on short notice (as opposed to the over one months' notice Mr. Copeland had given), and Ms. Butler responded that situation was "different."

24.     On April 20, 2018, Mr. Copeland again spoke with Ms. Butler and asked about taking April 23-27 off. Ms. Butler told Mr. Copeland that she would not give him the week off but would give him April 23rd and April 24th off and that she would give him another day off the following week *if he did not call in at all that week because of his narcolepsy*.

25.     In May 2018, Mr. Terry asked that Mr. Copeland submit revised FMLA paperwork. Mr. Copeland promptly submitted the requested paperwork.

26.     Mr. Terry and Mr. Copeland went through the FMLA paperwork and discussed the reasonable accommodations recommended therein.

27.     These accommodations included being up to two hours late for work up to five days a week, taking extra breaks as needed, ability to walk around, ability to say no to driving if feeling unsafe, ability to eat or drink to stay awake, dose alert or photo therapy light to improve wakefulness, an environment where asking for a break is permitted and accepted, ability to have alternative methods of notifying Mr. Copeland's supervisors if he was experiencing a flare-up and would be late, and opportunity to leave early if necessary.

28.     The revised FMLA paperwork also stated that narcolepsy flare-ups are completely unpredictable, uncontrollable, and exacerbated by stress.

29.     Mr. Terry instructed Mr. Copeland to bring the FMLA paperwork and medical documentation to his direct supervisor, Michele Butler. Ms. Butler and Mr. Copeland went through the accommodations suggested therein and agreed that they were reasonable. Mr. Terry also agreed that the accommodations were reasonable in a separate conversation.

30.     On May 21, 2018, Ms. Butler and Josh Tuel, the Associate Director for Genesis Development, pulled Mr. Copeland into the office to write him up for not calling in two hours prior to his scheduled shift and breaking Defendant's attendance policy.

31. Defendant's policy regarding attendance/promptness states that employees who are unable to report for their scheduled shift must contact and speak with their direct supervisor or the on-call supervisor two hours prior to the beginning of their scheduled shift.

32. Mr. Copeland asked if the attendance/tardiness policy would be the same for Mr. Copeland, given the FMLA paperwork stating that he needed more flexibility giving notice on days he would experience narcoleptic flare-ups. Ms. Butler and Mr. Tuel responded that the calling-in policy was the same for all employees, including Mr. Copeland, and that he was "no different."

33. Thus, the "accommodation" offered to Mr. Copeland (calling in two hours before his shift if he had a flare-up) was not actually an accommodation, but rather their stated policy. No compromise was made despite Mr. Copeland's FMLA paperwork and doctor indicating he needed flexibility with giving notice, including up to one hour before his scheduled shift.

34. Defendant did not understand what "intermittent" FMLA was and believed Mr. Copeland had to use his FMLA leave in one chunk of time rather than intermittently. Mr. Copeland informed Ms. Butler and Mr. Tuel that he could use his FMLA in an intermittent time frame, showed them the paperwork along with FMLA intermittent rights, and they made a copy of it.

35. After Mr. Copeland explained what intermittent FMLA was, Mr. Tuel dismissed and tore up the attendance write-up.

36. This meeting was the first time where Mr. Tuel recommended that Mr. Copeland have someone else call in for him when he could not awake in the morning. This was also the first time that Mr. Copeland's supervisors proposed switching Mr. Copeland's hours to 8am-4pm; however, Mr. Copeland informed them that the problem with his hours was not the block

6

of time scheduled, but that he needed accommodation for his unpredictable narcolepsy and flare-ups.

37.    On May 22, 2018, Mr. Terry re-issued the attendance write-up that Mr. Tuel had dismissed and destroyed and claimed that Ms. Butler and Mr. Tuel had made a mistake in dismissing the write-up.

38.    On May 31, 2018, Mr. Copeland called Melinda Austin of Human Resources to request information regarding a photo therapy light and left a voicemail. Mr. Copeland called Ms. Austin again on June 13, 2018. No one responded to Mr. Copeland's requests. No one from Human Resources ever spoke to Mr. Copeland until after he was terminated.

39.    In June 2018, Mr. Terry and Ms. Butler told Mr. Copeland that because narcolepsy is a lifetime condition his FMLA would be different than those under temporary disability. Mr. Terry and Ms. Butler told Mr. Copeland that FMLA is for people taking an extended period of time off and that Mr. Copeland needed to work on his attendance and "try harder" not to let narcolepsy affect his job.

40.    On June 20, 2018, Mr. Copeland was brought into the office for an "FMLA review" after he was forced to switch his hours. At this time, Mr. Copeland had just begun to take his prescribed Xyrem, a narcolepsy medication.

41.    Mr. Terry informed Mr. Copeland that Human Resources intended to come and talk to Mr. Copeland about his FMLA rights and to make sure that he knew how FMLA worked, but Human Resources did not show up for the meeting.

42.    Rather, Mr. Terry and Ms. Butler grilled Mr. Copeland about how long Xyrem would take to have an effect on him, how long it would take for them to see a change, and what the side effects of the medication were.

43.    Mr. Terry and Ms. Butler asked Mr. Copeland if he could file for disability, but Mr. Copeland told them that he wanted to work and did not want to be on disability.

44.    To educate Ms. Butler about narcolepsy, Mr. Copeland provided her with an informational pamphlet on Xyrem and an informational booklet on narcolepsy. Ms. Butler told Mr. Copeland that she did not read either one because she was too busy.

45.    Mr. Terry and Ms. Butler have been intolerant of any accommodations requested by Mr. Copeland.

46.    After being diagnosed with narcolepsy and before he was terminated, Mr. Copeland began to avoid asking for extra breaks even if he felt he needed one because his supervisors made it clear to him that an extra break would not be allowed or tolerated, and Mr. Copeland was fearful he would be terminated if he asked for an extra break.

47.    Mr. Copeland also never requested to leave early despite feeling a medical need to do so because he was fearful he would be terminated if he made such a request.

48.    Mr. Copeland was also afraid to use his FMLA leave in general because of Mr. Terry's constant reminders that he could fire Mr. Copeland if he wanted to.

49.    Defendant was constantly suspicious about Mr. Copeland's medical condition and his FMLA time usage. Mr. Terry agreed that Mr. Copeland's doctor's proposed accommodations were reasonable; however, when Mr. Copeland began to actually use those accommodations it became a problem for Defendant.

50.    No one from Defendant came to Mr. Copeland and said that the proposed accommodations were not reasonable for Mr. Copeland's position with Defendant; rather, Defendant agreed that the accommodations were reasonable but then treated Mr. Copeland with

8

derision and suspicion when he attempted to use the accommodations and attempted to withhold time off unrelated to his FMLA unless he did not use his FMLA.

51. Ms. Butler openly discussed Mr. Copeland's use of FMLA and narcolepsy diagnosis in front of other employees in non-supervisory positions. In one instance, Ms. Butler stated to several employees (including Mr. Copeland) that she would be taking some time off. She turned to Mr. Copeland and said that she needed advance notice "if you're going to do your thing." When Mr. Copeland asked her what she meant, she said she was referring to taking FMLA leave for his narcolepsy. Mr. Copeland was embarrassed, as he did not want his medical condition discussed openly with his coworkers.

52. Ms. Butler left Mr. Copeland's FMLA paperwork on her desk without putting it in any sort of file. Any employee who walked into Ms. Butler's office could have seen Mr. Copeland's private FMLA paperwork lying on top of her desk.

53. On July 26, 2018, Mr. Copeland filed a complaint with the ICRC and the EEOC because of Defendant's failure to allow him to use his FMLA.

54. On July 27, 2018, Mr. Copeland was called into the office and given a write-up accusing him of speaking badly about Defendant to others. Upon information and belief, the write-up was cut and pasted from another employee's write-up, as another employee's name was used in the write-up instead of Mr. Copeland's. Mr. Copeland was suspended for one day. The date on the write-up was also incorrect. Mr. Copeland denied, and continues to deny, that he had spoken badly about Defendant to anyone.

55. The suspension was unfair and discriminatory as it was based on unsubstantiated claims that Mr. Copeland said something negative about Defendant. It was a pretextual

suspension designed to lead to Mr. Copeland's ultimate termination because of Defendant's clear unwillingness to accommodate Mr. Copeland's disability.

56.     On July 30, 2018, Mr. Copeland experienced a flare-up and missed a day of work. His doctor recommended that he take FMLA leave for one week because his narcolepsy was being triggered by increased stress at work due to the suspension and general suspicious treatment he was receiving from Defendant.

57.     On July 31, 2018, Mr. Copeland went into the office and informed Ms. Butler and Mr. Terry that his doctor had recommended he take one week of FMLA leave from July 31, 2018 to August 7, 2018. Mr. Terry responded that he "guess[ed] [he'd] allow it this time."

58.     On August 7, 2018, Mr. Copeland returned to work. Mr. Terry called him into a conference room. Mr. Terry informed Mr. Copeland that Defendant was terminating his employment because Mr. Copeland had allegedly been using his cell phone to record conversations between himself and his supervisors.

59.     The stated reasons for Mr. Copeland's termination were as follows:

> 7-7.1 conduct: Confidentiality 702.8, 703.12 Phone Usage. Jeromey used his cell to record confidential conversations without the permission of the other staff. He recorded conversations with management discussing confidential matters and member concerns. It is illegal in the State of Iowa to record conversations with others without their knowing and/or permission.

> Policy states: 707.1 Sec 2 Sec E – Using access to confidential matters, individual served, funds, Genesis building or equipment, for personal gain, including divulging confidential information to unauthorized persons.

60.     Mr. Copeland did indeed record several conversations between himself and Mr. Terry; however, he recorded these conversations on a digital recorder, not a cell phone (negating the stated reason for termination as being for a violation of the "phone usage" policy).

61.     Mr. Copeland had begun to record conversations because Mr. Terry's attitude toward Mr. Copeland's medical condition and FMLA time usage, as well as Mr. Terry's constant reminders to Mr. Copeland that he could terminate Mr. Copeland's employment, began to raise red flags that Mr. Terry was looking for a reason to fire him. Mr. Copeland also recorded these conversations after reviewing Defendant's internal policies, which do not prohibit recording conversations unrelated to patient care (i.e., recordings that could be a HIPAA violation).

62.     Mr. Copeland's conversations with Mr. Terry did not involve member concerns, despite the statements in the Staff Discharge Summary.

63.     Mr. Copeland also understood that pursuant to Iowa Code Ann. § 808B.2, he was legally able to record through the use of any device without the other party's consent as long as the recording is done absent any criminal or tortious intent.

64.     Upon information and belief, Defendant terminated Mr. Copeland's employment because he filed a complaint with the Iowa Civil Rights Commission and because of Defendant's general unwillingness to accommodate his needs, despite having superficially agreed that they were reasonable.

65.     After termination, Mr. Copeland filed a second complaint with the Iowa Civil Rights Commission for retaliatory and discriminatory termination.

66.     Mr. Copeland's termination was discriminatory for several reasons. First, the stated reason for termination was pretextual because Mr. Copeland did not violate any of Defendant's policies regarding cell phones. It was also pretextual because nothing he recorded contained any confidential or HIPAA protected information. Mr. Copeland recorded his meetings with his supervisors because he believed they were searching for a reason to terminate him as a result of using his FMLA leave and an unwillingness to accommodate his disability.

11

Further, Mr. Terry admitted in the course of Mr. Copeland's unemployment hearing that he "assumes all his employees are recording him," and yet, no other employees have been terminated for alleged recordings.

67.     Mr. Copeland was terminated after using one week of his FMLA leave after his doctor recommended that he do so. Mr. Copeland was also terminated within ten days of filing his complaint with the Iowa Civil Rights Commission.

68.     Upon information and belief, Mr. Copeland's termination was motivated by three factors: (1) a desire to remove him as an employee because of the accommodations he needed as a result of his disability; (2) a desire to terminate his employment because Mr. Copeland was regularly using his FMLA leave; and (3) as retaliation for filing a complaint with the Iowa Civil Rights Commission.

**COUNT I –**
**DISABILITY DISCRIMINATION UNDER THE IOWA CIVIL RIGHTS ACT**

69.     Plaintiff realleges paragraphs 1-68 as if fully set forth herein.

70.     Mr. Copeland was a qualified individual with a disability. His narcolepsy substantially limits one or more major life activities. Mr. Copeland has a record of such impairment and is regarded as having such an impairment. As a direct result of his narcolepsy, Mr. Copeland has difficulty caring for himself, performing manual tasks, learning, and working.

71.     The actions complained of above constitute intentional discrimination on the basis of disability in violation of Iowa law. Iowa Code § 216.6(1)(*a*).

72.     Mr. Copeland was terminated because of his disability and his need for reasonable accommodation for the same and/or because he was perceived to have a disability.

73.     The actions complained of above caused financial and emotional damage to Mr. Copeland.

12

74.     As part of the discriminatory actions set forth above, Mr. Copeland was damaged in an amount to be determined at trial.

**COUNT II – VIOLATION OF FMLA – INTERFERENCE AND RESTRICTION OF USE OF FMLA LEAVE – 29 U.S.C. § 2615(a)(1)**

75.     Plaintiff realleges paragraphs 1-74 as if fully set forth herein.

76.     Defendant repeatedly interfered with, restrained, or denied Mr. Copeland's exercise of and the attempt to exercise his rights under FMLA.

77.     Mr. Terry and Ms. Butler would not allow Mr. Copeland to use time off (unrelated to medical leave) unless he did not use his FMLA leave. They repeatedly questioned his use of FMLA leave, did not accommodate his medical needs despite agreeing the recommended accommodations were reasonable, reminded him when he attempted to use his FMLA leave that they could terminate his employment, and ultimately terminated him for pretextual reasons after he took one week of FMLA leave as recommended by his doctor.

78.     Defendant is prohibited from interfering with an employee's exercise of rights under FMLA.

79.     Defendant acted in violation of 29 U.S.C. § 2615(a)(1) by interfering with Mr. Copeland's exercise of FMLA rights.

80.     Mr. Copeland was injured by Defendant's interference with his exercise of FMLA rights in an amount to be determined at trial.

**COUNT III – VIOLATION OF FMLA – INTERFERENCE AND RESTRICTION OF USE OF FMLA LEAVE (PRIVACY REQUIREMENTS) – C.F.R. § 825.500(g)**

81.     Plaintiff realleges paragraphs 1-80 as if fully set forth herein.

82.      Michele Butler openly discussed Mr. Copeland's FMLA leave and medical condition in front of employees who were not Mr. Copeland's supervisors and who did not need

to know, nor did they have a right to know, about Mr. Copeland's medical condition or use of FMLA. She left Mr. Copeland's FMLA paperwork on top of her desk without covering it in any way in such a manner that any employee who walked into her office could have seen Mr. Copeland's paperwork.

83.     Justin Terry instructed Mr. Copeland to show Ms. Butler his FMLA paperwork and medical documentation.

84.     Records and documents relating to certifications, recertifications, or medical histories of employees or employees' family members, created for purposes of FMLA, must be maintained as confidential medical records in separate files/records from the usual personnel files. 29 C.F.R. § 825.500(g).

85.     While supervisors and managers may be informed regarding necessary restrictions on the work or duties of an employee and necessary accommodations, *see* 29 C.F.R. § 825.500(g)(1), it is a violation of FMLA law and an interference with Mr. Copeland's right to use FMLA leave to require Mr. Copeland to show his medical paperwork to a supervisor.

86.     It is also a violation of FMLA law and an interference with Mr. Copeland's right to use FMLA leave to openly discuss his medical condition and use of FMLA in front of Mr. Copeland's coworkers (non-supervisors).

87.     Mr. Copeland has been damaged by Defendant's violation of FMLA law in an amount to be determined at trial.

### **COUNT IV – FMLA RETALIATION – U.S.C. § 2615(a)(2)**

88.     Plaintiff realleges paragraphs 1-87 as if fully set forth herein.

89.     Defendant terminated Mr. Copeland's employment after he returned from one week of FMLA leave, and within ten days of Mr. Copeland filing a claim regarding FMLA discrimination and interference with the Iowa Civil Rights Commission.

90.     The reasons stated for Mr. Copeland's termination were inaccurate and pretextual.

91.     The FMLA prohibits an employer from discharging or in any other manner discriminating against any individual for asserting his rights under the FMLA. 29 U.S.C. § 2615(a)(2).

92.     By using his FMLA rights, and by filing a claim with the Iowa Civil Rights Commission, Mr. Copeland engaged in a statutorily protected activity.

93.     As a result of engaging in a statutorily protected activity, Mr. Copeland suffered an adverse employment decision.

94.     The adverse employment decision was causally related to the protected activity.

95.     Mr. Copeland was damaged by Defendant's above-described retaliation in an amount to be determined at trial.

## COUNT V – DISABILITY DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT

96.     Plaintiff realleges paragraphs 1-95 as if fully set forth herein.

97.      Mr. Copeland is a qualified individual with a disability. His narcolepsy substantially limits one or more major life activities. Mr. Copeland has a record of such impairment and is regarded as having such impairment. As a direct result of his narcolepsy, Mr. Copeland has difficulty caring for himself, performing manual tasks, learning, and working.

98.     The actions complained above constitute intentional discrimination on the basis of disability in violation of the Americans With Disabilities Act. 42 U.S.C. § 12112.

99.     Mr. Copeland was terminated because of his disability and his need for reasonable accommodation for the same and/or because he was perceived to have a disability.

100.    The actions complained of caused financial and emotional damage to Mr. Copeland.

101.    As part of the discriminatory actions set forth above, Mr. Copeland was damaged in an amount to be determined at trial.

102.    The discriminatory actions described above were purposefully taken with malice and/or reckless disregard for the rights of Mr. Copeland, entitling him to an award of punitive damages. *See Foster v. Time Warner Entertainment Co., L.P.*, 250 F.3d 1189, 1196 (8th Cir. 2001) ("Punitive damages are appropriate if an employer engaged in intentional discrimination with malice or reckless indifference to the plaintiff's federally protected rights.") (internal citations omitted)).

WHEREAS, Mr. Copeland respectfully requests that this Court grant judgment in his favor and award him all damages flowing therefrom, including lost wages, emotional distress damages, punitive damages, costs, and attorneys' fees.

## JURY DEMAND

COMES NOW Plaintiff and hereby demands a trial by jury on all claims and issues presented herein.

Respectfully submitted,

*/s/ Alison F. Kanne*

Alison F. Kanne        AT0013262
Steven P. Wandro      AT0008177
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312
Telephone:    515/281-1475

Facsimile:     515/281-1474
Email: akanne@2501grand.com
swandro@2501grand.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of May, 2019, she served a true and correct copy of the above pleading by electronically filing with the Clerk of Court, through the ECF system, and via regular U.S. Mail on the parties listed below.

*/s/ Alison F. Kanne*

Joseph H. Laverty
Wessels Sherman Joerg Liszka
Laverty Seneczko P.C.
101 West 2nd St., Suite 307
Davenport, IA 53801
jolaverty@wesselssherman.com
ATTORNEY FOR DEFENDANT

17